**INTERNATIONAL PAPER COMPANY, Plaintiff,**

v.

**Mark A. SUWYN and Louisiana–Pacific Corporation, Defendants.**

**No. 96 Civ. 0143 (BDP).**

United States District Court, S.D. New York.

Jan. 6, 1997.

**446**

Dennis J. Block, Weil, Gotshal & Manges LLP, New York City, for Plaintiff.

Gary P. Naftalis, Kramer, Levin, Naftalis & Frankel, New York City, for Defendants.

### *MEMORANDUM DECISION AND ORDER*

PARKER, District Judge.

International Paper Company ("IP") has sued Mark A. Suwyn, its former Executive Vice President and the current Chairman and Chief Executive Officer of Louisiana–Pacific Corporation, alleging breaches of a noncompetition agreement and of fiduciary duties arising from Suwyn's departure from IP and his subsequent hiring by Louisiana–Pacific. Before the Court is defendants' motion for summary judgment pursuant to Fed. R.Civ.P. 56. For the reasons set forth, the motion is denied.

### BACKGROUND

Recognizing that on a motion for summary judgment all factual ambiguities are resolved, and reasonable inferences drawn, in the non-moving party's favor, *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980), the following facts are properly before the Court for purposes of this motion.

In January 1992, IP offered Suwyn the position of Executive Vice President of Forest and Specialty Products. A letter dated January 30, 1992 and signed by John Georges, then Chairman and CEO of IP, provided that Suwyn would "be eligible to participate in the company's Stock Option Plan" as well as other executive compensation plans under IP's Long Term Incentive Compensation Plan (LTICP). The letter mentions no duration of employment.

Suwyn commenced his employment with IP in March 1992. As Executive Vice President, Suwyn had oversight responsibility for IP's timberlands as well as for its forest products, building products, and paper distribution businesses. These business groups generated revenues of approximately $10 billion in 1995.

In 1994, IP requested certain of its most senior executives to execute a noncompetition agreement ("the Agreement"). The Agreement required its signatories to agree, for a period of eighteen months following the termination of their employment with IP, to refrain from joining any company that "produces, develops or markets, a product, process, or service which is competitive" with those of IP, "whether existing or planned for the future," and as to which the employee "has acquired knowledge of or had access to Protected Information" during the preceding five years.

Approximately seventy-five of IP's most senior executives, including Suwyn, were asked to sign the Agreement. According to IP, while no executive was threatened with termination, a failure to sign would jeopardize continued employment in the same position at IP. Moreover, any senior executive who was asked but failed to sign the Agreement would be precluded from receiving future incentive compensation under the LTICP.

Suwyn, although initially reluctant to do so, eventually signed the Agreement. He returned the signed Agreement with a side note dated July 17, 1994. The side note, the meaning and significance of which are principal issues in this case, states:

> I am returning a signed Noncompete Agreement (attached) with this note to record the discussions we have had on this subject so there is no confusion in the future. As you have described it and would intend to enforce it, the Agreement is aimed at restricting me from working for another major paper company such as Georgia Pacific, Champion or Weyerhauser for 18 months if I were to leave International Paper. In addition, it is aimed at restricting me from joining the Imaging businesses of Kodak, Fuji, Du Pont and Agfa as they are direct competitors with the Imaging business of International Paper. In the other business areas under my responsibility we are more of a niche player and therefore the agreement would not be viewed as being in force when it comes to joining such companies as Xerox, Dow, Exxon and other participants in broad industries in which we compete.

On January 2, 1996, Suwyn tendered his resignation from IP and joined Louisiana–Pacific as Chairman and CEO. A short while later, on January 10, 1996, IP brought this action for injunctive relief, asserting claims against Suwyn for breach of the Agreement and breach of fiduciary duty, and against Louisiana–Pacific for tortious interference with contractual relations. Defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56, is now before this Court.

## DISCUSSION

In pursuit of summary judgment, Suwyn advances the argument that the Agreement is void for lack of consideration because it was supported only by IP's promise to perform a preexisting contractual duty—in other words, its obligation to qualify Suwyn for certain stock options and performance-based compensation plans. Suwyn contends that the terms of the January 1992 letter already entitled him to continued eligibility for the compensation programs. Thus, IP's subsequent conditioning of Suwyn's continued eligibility for incentive compensation on his execution of the Agreement would have been a promise to perform a preexisting contractual obligation—a promise without new consideration and hence insufficient to support the covenant not to compete imposed

**448**

by the Agreement. Since this syllogism does not accord with applicable law, defendants' motion on this theory is denied.

■ Suwyn is correct that consideration is a necessary prerequisite to a valid contract and that a promise to perform an existing legal or contractual obligation is, without more, insufficient consideration to support a new contract. *Roth v. Isomed, Inc.*, 746 F.Supp. 316, 319 (S.D.N.Y.1990); *Goncalves v. Regent Int'l Hotels, Ltd.*, 58 N.Y.2d 206, 460 N.Y.S.2d 750, 447 N.E.2d 693 (1983); *James A. Haggerty Lumber & Mill Work, Inc. v. Thompson Starrett Constr. Co.*, 22 A.D.2d 509, 510, 256 N.Y.S.2d 1011, 1012 (1st Dep't 1965).

■ Also, neither party disputes that under New York law unless the duration of an employment contract is set forth explicitly, the employment is at-will and can be terminated by either party at any time. *Wright v. Cayan*, 817 F.2d 999, 1002 (2d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *see Sabetay v. Sterling Drug. Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920–21 (1987); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 304–05, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 90–91 (1983). The hallmark of an employment-at-will relationship is that the employer is "free to modify the terms of the [employee's] employment, subject only to [the employee's] right to leave his employment if he found the new terms unacceptable." *Bottini v. Lewis & Judge Co.*, 211 A.D.2d 1006, 1008, 621 N.Y.S.2d 753, 754 (3d Dep't 1995); *General Electric Technical Servs. Co. v. Clinton*, 173 A.D.2d 86, 88, 577 N.Y.S.2d 719, 720 (3d Dep't 1991).

■ The January 1992 letter neither recited a fixed duration of employment, nor provided an express limitation on IP's right to terminate Suwyn's employment. Accordingly, absent any contrary evidence, this Court concludes that Suwyn was an at-will employee of IP and could be terminated at any time. *See Wright*, 817 F.2d at 1003. Assuming that the January 1992 letter entitled Suwyn to qualify for certain stock-related awards pursuant to IP's LTICP, once IP changed the terms of Suwyn's employment by requiring Suwyn to execute the Agreement and Suwyn opted to remain employed at IP for a number of months, he effectively assented to the modification and commenced employment under new terms. *See Bottini*, 211 A.D.2d at 1008; 621 N.Y.S.2d at 754; *General Electric Technical Servs.*, 173 A.D.2d at 88, 577 N.Y.S.2d at 720. Because IP, an at-will employer, had the right to discharge Suwyn without cause, forbearance from that right was a legal detriment which forms consideration for the restrictive covenant. *Zellner v. Stephen D. Conrad*, 183 A.D.2d 250, 256, 589 N.Y.S.2d 903, 906 (2d Dep't 1992). Under New York law, "because in an at-will employment the employer has the right to discharge the employee ... without cause, and without being subject to inquiry as to his motives ... forbearance of that right is a legal detriment which can stand as consideration for a restrictive covenant."[1] *Zellner v. Stephen D. Conrad*, 183 A.D.2d at 256, 589 N.Y.S.2d at 906.

■ Furthermore, Suwyn continued at IP after he signed the Agreement and the side note. Where any employment relationship continues for a substantial period after the covenant is given, the forbearance necessary to constitute consideration is "real, not illusory and the consideration given for the promise is validated." *Id.* These principles compel the conclusion that the Agreement was supported by consideration and is not rendered unenforceable. *Roth*, 746 F.Supp. at 319; *James A. Haggerty Lumber*, 22 A.D.2d at 510, 256 N.Y.S.2d at 1012.

■ Defendants further challenge the Agreement on the ground that it is unreason-

1. In *Zellner v. Stephen D. Conrad*, 183 A.D.2d at 255, 589 N.Y.S.2d at 907, the Appellate Division, Second Department, recognized that courts in other jurisdictions have held that some additional consideration, not the mere continuation of employment, must be given to support a restrictive covenant once employment has begun. The *Zellner* court, however, expressly rejected that view and adopted the alternative position that continued employment as consideration was sufficient to support a covenant not to compete "where discharge was the alternative or where the employee remained with the employer for a substantial time after the covenant was signed." *Id.*

ably broad and thereby unenforceable. A noncompetition agreement is enforceable only if it is (1) reasonable in duration and geographical area, (2) not burdensome to the employee, (3) not harmful to the general public, and (4) necessary for the employer's protection. *See American Institute of Chemical Engineers v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982); *Reed, Roberts Assocs. Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593–94 (1976); *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 467, 536 N.Y.S.2d 752, 753 (1st Dep't 1989).

Defendants' presentations in support of summary judgment, however, fall short of actually demonstrating that enforcement of the Agreement imposes unreasonable time limitations or any harm to the general public, or that it is otherwise so unreasonable as to be unenforceable. Rather, in a somewhat conclusory manner, defendants contend that the Agreement is "unreasonably burdensome" to Suwyn and "harmful to the general public." While defendants do assert that "Suwyn would suffer the extreme burden of being effectively unemployable for a period of 18 months," Suwyn himself has stated that his skills are those of an executive manager, applicable to any business in a wide range of industries in which he is free to seek employment. Suwyn Dep. at 417–18.[2]

Accordingly, drawing all factual inferences in favor of IP, this Court cannot conclude on the basis of the evidence adduced thus far that the Agreement is so unreasonably burdensome as to warrant a finding that it is unenforceable. Indeed, each of the factors that must be analyzed involve triable issues of fact centered on reasonability that preclude the grant of summary judgment. *See Tender Loving Care v. Franzese*, 131 A.D.2d 747, 748, 517 N.Y.S.2d 50, 51 (2d Dep't 1987).

As defendants correctly point out, even if this Court were to determine that the Agreement is reasonable, the restrictive covenant would only be enforceable to "the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information" or "where an employee's services are

unique or extraordinary." *Reed, Roberts Assocs.*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d at 593. Here, IP alleges that Suwyn was privy to the following "highly confidential" information: (1) IP's three to five year strategic plans; (2) actual cost information concerning IP's plans; (3) proposed plant construction and/or closings; (4) sensitive research with respect to IP's business; (5) genetics information; and (6) various acquisition targets. These allegations further create an issue of fact which cannot be summarily resolved. *See Tender Loving Care*, 131 A.D.2d at 748, 517 N.Y.S.2d at 51.

■ Other contentions advanced in support of, or in opposition to, summary judgment similarly present factual questions of contract interpretation. Summary judgment, as here, on a question of contract construction, is appropriate only where the agreement's language is unambiguous and conveys a definite meaning. *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). Where, however, the contractual language used is susceptible to differing interpretations, each of which may be said to be "reasonable," and where there may be relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate. *Sayers*, 7 F.3d at 1094; *Seiden Assocs.*, 959 F.2d at 428.

■ Here, for example, before considering the language of the Agreement itself, this Court must address the threshold question of whether the side note reflects the parties' intent to modify the Agreement or was merely a summary of Suwyn's discussions about the Agreement with John Georges. If, on one hand, the note is deemed a modification, then it could be viewed as a counteroffer that, when accepted, became part of the Agreement. If, on the other hand, the side note was designed simply to record the discussions between Georges and Suwyn, then the note would be parole evidence, inadmissi-

---

**2.** Prior to working at IP, Suwyn was employed by DuPont for twenty-five years, where he was

responsible for imaging systems, medical products, human resources, and corporate marketing.

**450**

ble to add to or vary the terms of the Agreement. *Mizuna, Ltd. v. Crossland Federal Savings Bank,* 90 F.3d 650, 659 (2d Cir. 1996); *Readco Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996); *W.W.W. Assocs., Inc., v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). Because conclusions concerning, *inter alia,* the significance of the side note intended by IP and Suwyn require further factual development at trial, summary judgment is not appropriate.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is denied. *See* Fed.R.Civ.P. 56(a).

**SO ORDERED.**